Filed 2/22/21  P. v. Beard CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>DUREE ANTHONY BEARD,<br><br>Defendant and Appellant. | F076716<br><br>(Super. Ct. No. BF146573A)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  John D. Oglesby, Judge.

Janet J. Gray, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez and Ian Whitney, for Plaintiff and Respondent.

-ooOoo-

Duree Anthony Beard contends on appeal the trial court (1) erred in failing to give a unanimity instruction, (2) abused its discretion in imposing consecutive sentences, (3) violated Penal Code section 654[1] in imposing separate sentences for two crimes premised upon the same act, and (4) erred in imposing multiple enhancements for each prior prison term. After briefing was complete, we invited the parties to submit further briefing regarding the impact of Senate Bill No. 136 (2019-2020 Reg. Sess.) (Senate Bill No. 136) on the prior prison term enhancements. The parties agree Beard's prior prison term enhancements should be stricken. We strike the prior prison term enhancements and affirm in all other respects.

## PROCEDURAL SUMMARY

On December 13, 2016, the Kern County District Attorney charged Beard with rape (§ 261, subd. (a)(2); count 1), forcible oral copulation (former § 288a, subd. (c)(2), current § 287, subd. (c)(2)(A); count 2), first degree robbery (§ 212.5, subd. (a); count 3), unlawfully dissuading a witness (§ 136.1, subd. (c)(1); count 4), and false imprisonment (§ 236; count 5). As to counts 1 and 2, the information also alleged Beard committed the crimes during the commission of a residential burglary with the intent to commit a sex offense (§ 667.61, subd. (d)(4)). As to all counts, the information further alleged Beard personally used a deadly weapon in the commission of the charged crimes (§§ 667.61, subd. (e)(3), 12022, subd. (b)(1)) and had served five prior prison terms (§ 667.5, subd. (b)). Beard pled not guilty to all counts and denied all special allegations.

Count 3 was dismissed prior to trial.

On November 6, 2017, the jury found Beard guilty on counts 1, 2, 4, and 5; found true the weapon allegations on counts 1, 2, 4, and 5; and found true the burglary to commit a sex offense allegations on counts 1 and 2.

---

[1] All further statutory references are to the Penal Code unless otherwise stated.

In a bifurcated proceeding on November 6, 2017, the trial court found true the allegations that Beard had served three prior prison terms, two for convictions of second degree burglary (§ 460, subd. (b)) in 2007 and 2010, and one for convictions of recklessly evading a peace officer (Veh. Code, § 2800.2) and possession of a stolen vehicle (§ 496d) in 2005.  Based on the parties' stipulation, the court dismissed the fourth and fifth prior prison term allegations.

On December 5, 2017, the trial court sentenced Beard to prison for 65 years to life as follows:  on count 1, 25 years to life, plus three 1-year prior prison term enhancements; on count 2, 25 years to life, plus three 1-year prior prison term enhancements, to be served consecutively to the sentence on count 1; on count 4, four years, plus a one-year personal use of a deadly weapon enhancement, plus three 1-year prior prison term enhancements, to be served consecutively to the sentence on count 1; on count 5, eight months, plus a four-month personal use of a deadly weapon enhancement, to be served consecutively to the sentence on count 1.

## FACTUAL SUMMARY

*Prosecution's Case*

### *D.H. and the Neighbors*

D.H. testified that on January 13, 2013,[2] she made her husband move out of the house after he physically abused her.  Two elderly women and a younger man lived next door to her.[3]  The man slept in the garage.  D.H. had talked to the women three or four times but never communicated more than simple messages because she spoke only Spanish and they spoke no Spanish.  She saw the man on several occasions, but she never spoke to him and could not identify him.  She may have heard his voice at some point, but she said she would not recognize it if she heard it again.  She was unable to identify

---

[2]     All further dates refer to the year 2013 unless otherwise stated.

[3]     D.H. did not recognize Beard as the man who lived next door to her.

Beard in the courtroom. She testified she never had consensual sex with Beard or any man around the time she separated from her husband.

### The Sexual Assault

On January 16, three days after her husband moved out, 60-year-old D.H. walked from her bedroom to her kitchen at roughly 10:00 p.m. As she did so, she encountered a man in the hallway of her house wearing a hooded sweatshirt with the hood pulled up, dark clothing, and gloves. She did not recognize the man and could not make out his appearance because it was dark in the hall. However, she was sure he was not her husband. The man then covered D.H.'s mouth with his hand and forced her to her bedroom by pressing a metal icepick or screwdriver that measured between eight and 10 inches against her back. He told her to take her clothes off, but she did not immediately understand what he was saying because she did not speak English. When she did not undress, he used gestures to make himself understood. D.H. then understood and disrobed. The man forced her to her knees and forced her to orally copulate him for "a long time." He then forced her to brush her teeth.

At some point after the forced oral sex, the man raped D.H. while she was face down on the bed. Then he forced her to take a shower in the bathroom connected to the bedroom. She took a shower and put on a robe. D.H. then tried to escape but the man caught her and brought her back to the bedroom. He took the robe off of her, forced her to lie on her back on the bed, and raped her a second time.[4] He then forced her to shower again.

---

**4** Initially, D.H. testified she did not remember what happened when the man forced her onto her back on the bed after she attempted to escape. She later testified that the man raped her more than one time and forced her to take a shower more than one time. She testified that at least one of the times she was raped, she was lying face down on her bed. She was not sure if she was completely on the bed or bent over the bed.

Next, the man made D.H. walk around the house in front of him. He commented that she did not have any valuables. He then took a laptop computer in a case and left the house through the front door.

At least two hours after the man left, at 12:59 a.m. on January 17, D.H. called 911, when she heard a knock on her front door.[5] She did not see who knocked on the door, but she feared it was the man who had raped her. She did not call the police sooner because she was "scared" and "ashamed." The man had told her he would kill her if she called the police.

D.H. testified she "resent[ed]" her husband for moving out, but she did not make up the story about getting raped to get back at him.

### The Police Response

#### The First Interview

Bakersfield Police Officer Gabriel Herriott responded to D.H.'s 911 call. He arrived at D.H.'s house at approximately 1:10 a.m. on January 17. D.H. "was crying, … pacing back and forth inside … her residence[,] … and kept [repeating] … that she had just been raped." D.H. spoke "very limited" English, so Herriott called a police dispatcher to translate.

D.H. told Herriott that at about 11:00 p.m. on January 16, as she went to take her medication in her kitchen, an unknown man grabbed her from behind, holding an icepick. He told her not to scream, forced her to the bedroom, "told to remove her clothes," and "forced [her] to orally copulate" him. After several minutes, he "instructed her to lay on the bed, [face] down, where he forced himself sexually on her by placing his penis in her vagina."[6] During the rape, he said, " 'You like it, don't you? You like it, bitch.' " After

---

[5]    The 911 call was in Spanish. A portion of the call was played for the jury. The parties also provided the jury with a translated transcript of the call.

[6]    Herriott testified D.H. only told him about one rape.

the rape, he forced her to take a shower. After she showered, he took her to the living room, where he took her laptop computer, and left through the interior garage door.

D.H. described the man who raped her as "a black male adult, approximately 30 [to] 35 years old, … wearing a black hooded sweatshirt."

### *D.H.'s House*

As Herriott took D.H.'s statement, Bakersfield Police Officer Clifton Ary searched D.H.'s house and found a Chapstick, a Leatherman multi-tool, and a lighter at the foot of D.H.'s bed. None of those items belonged to D.H.

Meanwhile, Bakersfield Police Officer Donald Cegielski looked for any signs of forced entry. D.H.'s garage, which was attached to her house, was adjacent to the neighboring garage that Beard lived in, separated by the two side yards and a five-to six-foot-tall wooden fence. Cegielski examined the exterior "man door" into D.H.'s garage from the side yard. The wooden door, which opened in, was covered with a metal security screen door, which opened out. Cegielski found damage to the wooden door near the door latch and also fresh pry marks on the exterior of the wooden door frame. The deadbolt on the wooden door was not engaged. There were no noticeable signs of tampering on the security screen door. Cegielski concluded the man had entered the garage through this man door.

### *The Sexual Assault Examination*

On the morning of January 17, after Herriott finished interviewing D.H. and the other officers finished investigating at her house, Herriott took her to the hospital where she was physically examined. The nurse examined D.H.'s external genital area, looking for "abrasions, cuts, bruises, tears, [or] anything [unusual]." The nurse found and photographed "a small laceration" on D.H.'s "posterior fourchette." The injury was consistent with "some type of trauma to that area." The nurse also found and

photographed a bruise on D.H.'s right hand. After the nurse finished the physical examination, she took swabs from D.H.'s mouth, neck, vagina, and external genital area.

### *The Second Interview*

At 6:45 a.m. on January 17, Bakersfield Police Detective Jeremy Blakemore interviewed D.H. at the police station with the assistance of a translator.[7]

D.H. told Blakemore she saw the man in her living room when she exited her bedroom. He brandished a screwdriver or icepick at her as a weapon, held it near her chest, and forced her to the bedroom. He told her to take off her clothes and she complied. He told her to get onto her knees and she responded that she could not because she had pain in her knees. He forced her to sit on the bed and orally copulate him for several minutes. The man then forced D.H. onto her stomach and raped her. He told her to brush her teeth and take a shower, directing her to "scrub her waist region," but told her not to wet her hair. After D.H. complied with those instructions, the man brought her back to the bedroom and raped her a second time and ejaculated. Either during or immediately after the second rape, he looked at some paperwork scattered on the bed that bore D.H.'s husband's name, gestured to it, and called the husband a "bastard."[8] D.H. responded that "all men were bastards." The man then suggested D.H. get a job at a Wendy's restaurant. After the second rape, he forced D.H. to take a second shower.

After the second shower, the man led D.H. around the house, looking at various pieces of her property. He took a laptop computer that was in her bedroom. He then left the house through the front door as D.H. lay on her couch covered by a blanket. D.H. immediately got up and locked the front door. Within about an hour, she heard a knock

---

[7] The interview was video recorded. The recording was played for the jury.

[8] Blakemore initially indicated D.H. said the man's discussion with her about the paperwork did not take place until after the second incident of vaginal penetration. However, on cross-examination, he acknowledged that according to his notes the man may have temporarily ceased the sexual assault to comment on the papers.

at the front door and heard what she believed to be the man's voice, saying, " 'This is Alex.' " She called 911.

When Blakemore asked D.H. how she thought the man got into her house, she told him she was "certain" the door leading into the house from the garage was left unlocked and "fairly certain" the wooden man door leading into the garage from the side yard was unlocked. She did not comment on whether the security screen door was locked.

D.H. also told Blakemore she was unable to see the face of the man who raped her because he directed her to look away. However, the man sounded like Beard, to whom she had briefly spoken once or twice in the preceding month. She previously spoke to Beard and his mother[9] about having suffered domestic abuse by her husband.

### *The Recovery of D.H.'s Property and Search of Beard's Residence*

On January 17, Cegielski "put an alert out to different pawnshops" for the laptop brand and model stolen from D.H.'s house. On the same date, an employee at the Wooden Nickel pawn shop called Cegielski, telling him Beard had sold a laptop that met his description. Cegielski browsed the contents of the laptop and found photographs of D.H. He then obtained the pawn shop sales receipt bearing Beard's name. Cegielski showed the laptop to D.H. who confirmed it was the laptop stolen from her house by the man who raped her.

Officers learned Beard was on probation and, on January 17, at approximately 11:00 a.m., conducted a search of the garage next door to D.H.'s home where he resided. Bakersfield Police Officer Daniel McAfee, testified he found drawers in the garage labeled with Beard's name and a certificate bearing his name. Police Crime Laboratory Technician Destinie Martinez recovered an empty black Leatherman multi-tool case and a black hooded sweatshirt from the garage.

---

[9] The women Beard lived with were actually his foster mother (Roberta Y.) and her daughter (Marianne R.).

Martinez and McAfee also discovered a laptop case in a trash can outside of the garage. The laptop case contained an orange beanie, a pair of black utility gloves, and a letter from D.H.'s husband. D.H. confirmed the laptop case was hers. In the same trash can, Martinez and McAfee also found a trash bag containing a pair of size 13 Nike shoes and a green towel.

### *Identification of Beard*

Blakemore showed D.H. two different photographic lineups containing Beard's photo. Different photographs of Beard were used in each lineup. D.H. did not identify Beard as her rapist or her neighbor in either of the two photographic lineups.

On January 18, Blakemore took a buccal swab from D.H. On November 22, 2016, Bakersfield Police Officer Eric Littlefield took a buccal swab from Beard. Kern Regional Crime Laboratory forensic laboratory technician Carol Williams prepared samples for DNA testing of the buccal swabs from D.H. and Beard; the Leatherman multi-tool, the Chapstick, and the cigarette lighter recovered in D.H.'s bedroom; and the swabs taken from D.H. during the sexual assault examination. Williams took samples from two of the four internal vaginal swabs obtained from D.H. during the sexual assault examination. Both samples tested positive for semen and a visual examination using a microscope showed the presence of sperm cells. Williams testified that, based on the level of deterioration of the sperm cells, it was possible the sperm sample was collected more than 24 hours after intercourse. However, based on the number of visible sperm cells, the morphology of the sperm cells, and the strength of the response of the test for semen as compared to the same testing in other cases, the sample was "probably [collected] within 12 hours" of deposit.

Williams also took a sample from one of the two external genital area swabs and a sample from one of the two oral swabs. Both samples tested negative for sperm cells. Finally, she took samples from the lighter, Chapstick, and multi-tool for DNA analysis.

9.

Kern Regional Crime Laboratory criminalist Brook Ramirez processed DNA samples from D.H.'s vaginal swabs, the Leatherman multi-tool, the Chapstick, and the lighter. Ramirez extracted the DNA from the samples and created DNA profiles from the extracted DNA. Kern Regional Crime Laboratory forensic laboratory technician Alfredo Bayaca processed the known samples taken from D.H. and Beard. He extracted the DNA from the samples and created DNA profiles from the extracted DNA.

Kern Regional Crime Laboratory criminalist Mandi Van Buren interpreted the DNA profiles created from the vaginal swabs, the Leatherman multi-tool, the Chapstick, and the lighter, and the known DNA profiles from D.H. and Beard. D.H. was excluded as a contributor to the DNA profile created from the lighter, but Van Buren could not conclude whether Beard was a contributor to the DNA profile created from the lighter. As to the Leatherman multi-tool, again D.H. was excluded as a contributor to the DNA profile, but Beard could not be excluded as a contributor to the profile. Beard was 57 quadrillion times more likely than a random match from the African-American population to have been a contributor to the Leatherman multi-tool profile, 11 quadrillion times more likely than a random match from the Caucasian population, and 65 quadrillion times more likely than a random match from the Hispanic population. As to the Chapstick, Beard was 1.9 quintillion times more likely to have been a contributor than a random match from the African-American population. As to the sperm cell isolated from the vaginal sample, Beard was 500 quadrillion times more likely to have been a contributor than a random match from the African-American population.

### Defense Case

Marianne R. testified that Beard was her mother's foster child. In January 2013, Marianne and her mother, Roberta Y., lived next door to D.H. Beard occasionally stayed nights in their garage during that time. Marianne only permitted Beard to spend the night if he arrived home before 10:00 p.m.

Marianne testified D.H. came to her approximately three times because D.H. was having problems with her husband. D.H. told Marianne that her husband abused her and he had brought a mistress to Bakersfield from Las Vegas.

Beard testified in his own defense. Beard admitted a 2010 conviction for burglary, a 2008 conviction for burglary, a 2004 conviction for possession of stolen property, and a 2002 conviction for petty theft. During 2012 and January 2013, Beard spent some nights in his foster mother's garage, some nights with his girlfriend, and some nights with his brother. He stayed in the garage between one and three times per week.

In June 2012, Beard met D.H. and her husband while they were doing yardwork. Beard saw D.H. go into his foster mother's house on one occasion, but he was not present for their conversation. On a second occasion, he saw D.H. walking to his foster mother's house and she appeared angry. They talked and D.H. told Beard that her husband had hit her. Beard offered to help her. In November 2012, Beard went to D.H.'s house to help her. He spoke to her in the driveway in front of her house and she told him about her husband's abuse and her husband's mistress. D.H. told Beard that her husband brought the mistress to her house.

In late November 2012, Beard was outside of his foster mother's house and knew he could not go inside because he was under the influence of alcohol. D.H. invited him into her house to "sober up." She told him she wanted him to hurt her husband. She offered Beard a laptop and a bag of methamphetamine in exchange for hurting her husband. Beard accepted the laptop and methamphetamine from D.H. Although there was a language gap, Beard understood that D.H. wanted him to hurt her husband because she made a gun gesture with her hand when she asked Beard to hurt him.

Beard testified he had consensual sex with D.H. once in late December 2012 or early January 2013. He denied ever having broken into D.H.'s house. Beard also denied ever having had sex with D.H. without her consent.

11.

Beard testified that at some point after D.H. asked him to hurt her husband, he found a .38-caliber revolver in his foster mother's garage and purchased .38-caliber ammunition. He eventually decided not to follow through on the agreement to hurt D.H.'s husband, and he told D.H. he was not going to do it. D.H. was "mad" and demanded that Beard give the laptop and methamphetamine back. Beard refused.

Beard testified he kept the laptop for approximately two weeks after D.H. gave it to him. Then, on January 17, before 10:00 a.m., he sold the laptop to the Wooden Nickel pawn shop. At 2:09 p.m. on the same day, he got on a bus leaving town. Beard testified that he left town because his foster mother told him police had searched the house and found bullets. He knew that if he returned, he likely faced a parole violation or new charges based on the ammunition he was not permitted to possess.

Beard testified the Leatherman multi-tool, the Chapstick, and the lighter found in D.H.'s house all belonged to him. He did not know when he left those items at her house because he had been in the house multiple times. However, Beard testified he had not been to D.H.'s house for several days before he sold the laptop and left town. Beard testified he threw the laptop case in the garbage at his foster mother's house "a couple of days" before he left town. He also threw out his Nike tennis shoes because they were dirty.

## DISCUSSION

### I. Unanimity Instruction

Beard was charged with and convicted of one count of forcible rape. Beard argues that a unanimity instruction was required because "[t]he prosecutor introduced evidence of two separate acts that could have constituted the alleged rape violation." The People respond that a unanimity instruction was not required because "[t]he two forcible rapes happened as part of one continuous course of conduct and there was no reasonable basis for the jury to distinguish between them." The People are correct.

12.

## A.    Standard of Review

Appellate review of a trial court's decision "to give any particular instruction in any particular case entails the resolution of a mixed question of law and fact," but the inquiry is "predominantly legal."  (*People v. Waidla* (2000) 22 Cal.4th 690, 733.)  Therefore, a claim of instructional error is "examined without deference."  (*Ibid*.)

## B.    Background

The prosecutor introduced evidence that could support a finding that Beard committed two acts of rape.  D.H. testified the man raped her more than one time, but she did not clearly describe the differentiating details of the different acts.  Detective Blakemore testified D.H. told him the man raped her, forced her to take a shower, and then raped her a second time.  Officer Herriott, however, testified D.H. told him she was raped one time.

During trial, the court considered whether to give a unanimity instruction, explaining:

> "I have flagged the Court's unanimity [instruction], which I have proposed I will withdraw at this time.  The Court had articulated to counsel that there are two individual acts, based upon the best evidence of the People's case of rape by [Beard] of [D.H.], which was interrupted to look at certain documents[.]  [T]hat will be one view of the evidence.  And the Court was somewhat concerned that maybe the jury needed to have an election between [the acts] if they were going to convict [Beard] of the charge of … rape.  [After d]iscussion with counsel off the record, I think the People's position of this is this was a continuous course of conduct.  And as such, I don't think unanimity is required whe[re] there's a continuous course of different sexual acts.  I don't think the jury is required to elect between these particular acts under these circumstances.  So I'm inclined not to give that, unless either side wants to be heard further on it."

Neither side asked to be heard further on the issue and the court did not give the unanimity instruction.

Later, during closing argument, the prosecutor did not elect a single act as the basis for the rape charge.  Instead, she argued:  "[Beard] turned [D.H.] on her stomach,

13.

bent her over the bed, and he raped her. He made her take a shower and brush her teeth. She attempted to run, but he grabbed her back. [¶] Then he bent her over again, he raped her again, and this time he ejaculated."

## C. Analysis

In a criminal case, a jury verdict must be unanimous. (U.S. Const., 6th Amend.; Cal. Const., art. I, §16; *People v. Anzalone* (2013) 56 Cal.4th 545, 555.) Further, "the jury must agree unanimously the defendant is guilty of a *specific* crime." (*People v. Russo* (2001) 25 Cal.4th 1124, 1132.) "Therefore, cases have long held that when the evidence suggests more than one discrete crime, either the prosecution must elect among the crimes or the court must require the jury to agree on the same criminal act." (*Ibid.*) A unanimity instruction eliminates the danger a criminal defendant will be convicted without the jurors agreeing that the defendant committed a single criminal offense. (*Ibid*; *People v. Melhado* (1998) 60 Cal.App.4th 1529, 1534.) However, " ' "[a] unanimity instruction is required only if the jurors could otherwise disagree which act a defendant committed and yet convict him of the crime charged." ' " (*People v. Champion* (1995) 9 Cal.4th 879, 932 (*Champion*), overruled on other grounds in *People v. Combs* (2004) 34 Cal.4th 821, 860.)

As the People assert, the continuous course of conduct exception to the requirement of a unanimity instruction applied in this case. This exception, as relevant here, applies in two situations where no possibility of juror disagreement exists—the single transaction situation and the same defense situation. The single transaction situation arises when " ' "the acts were substantially identical in nature, and close enough in time to constitute a single transaction, such] that any juror believing one act took place would inexorably believe all acts took place." ' " (*Champion*, *supra*, 9 Cal.4th at p. 932; accord *People v. Hernandez* (2013) 217 Cal.App.4th 559, 572 (*Hernandez*) [where two criminal acts were part of a "single transaction or course of criminal conduct," no

unanimity instruction is required]; see *People v. Gonzalez* (1983) 141 Cal.App.3d 786, 791 (*Gonzalez*), fn. omitted ["the possibility of disagreement exists where the defendant is accused of a number of unrelated incidents, such as alleged rapes at different times or places, leaving the jurors free to believe different parts of the testimony and yet convict the defendant"], disapproved on other grounds in *People v. Kurtzman* (1988) 46 Cal.3d 322, 330; *People v. Jennings* (2010) 50 Cal.4th 616, 679 (*Jennings*) [no unanimity instruction is required " 'when the acts [were] so closely connected in time as to form part of one transaction' "].)

The same defense situation arises " ' " 'when the defendant offers essentially the same defense to each of the acts, and there is no reasonable basis for the jury to distinguish between them.' " ' " (*Hernandez*, *supra*, 217 Cal.App.4th at p. 572; see *Jennings*, *supra*, 50 Cal.4th at p. 679; *Gonzalez*, *supra*, 141 Cal.3d. at p. 792, fn. omitted ["[d]isagreement may … exist where the defendant offers a defense which could be accepted or rejected as to some but not all of the acts"].)

In *Champion*, both situations applied. There, "the rape victim testified that [the] defendant … raped her twice, but the two rapes were virtually identical. After raping [the victim] in the bathroom, [the defendant] left, returning shortly thereafter to rape her again. [The defendant] offered no evidence tending to show that he committed one of the rapes but not the other; rather, his counsel argued that he did not participate in any of the [charged] crimes." (*Champion*, *supra*, 9 Cal.4th at p. 932.) Our Supreme Court determined no unanimity instruction was required because, "once a juror determined that [the] defendant … committed one of the two rapes, it [was] inconceivable that the juror would not also conclude that [the defendant] also committed the second rape of the same victim." (*Ibid*.)

Similarly, both situations applied here also. First, as in *Champion*, there was no risk of jury disagreement as a result of the two possible acts underlying the rape

conviction having been committed at different times or places. (*Champion*, *supra*, 9 Cal.4th at p. 932.) D.H. was raped twice in her bedroom, interrupted by Beard forcing her to shower and brush her teeth (and possibly by Beard reading documents on her bed, calling her husband a "bastard," and giving her advice on where to find a job). The two acts of rape constituted a continuous course of conduct. Once a juror concluded the first rape took place, he or she would necessarily have concluded the second rape also took place. For that reason, no unanimity instruction was required.

Second, as in *Champion*, Beard's defense was that he did not participate in any of the offenses of which he was accused. (*Champion*, *supra*, 9 Cal.4th at p. 932.) Beard did not raise any defense that the jury could have accepted as to one of the acts of rape but rejected as to the other. Beard testified he had sex with D.H. only one time, in late December 2012 or early January 2013. He testified he was not at D.H.'s house on the day the rape occurred, did not break into her house, and did not have sex with her that day. He suggested D.H. fabricated the story because he refused to hurt her husband after accepting the laptop and methamphetamine as payment. Based on that defense, the jury could not reasonably have concluded he "committed one of the rapes but not the other." (*Champion*, *supra*, at p. 932.) For this reason also, no unanimity instruction was required.

Accordingly, in this case, no unanimity instruction was required because the two acts of rape were part of a single transaction, and because Beard's defense was the same for both acts and there was no reasonable basis for the jury to distinguish between the acts.

Beard argues D.H.'s "waver[ing] … recollection of when [the] second act of intercourse occurred" and Officer Herriott's testimony that D.H. only reported one rape could have led the jury to "rel[y] on [one] or the other of the incidents as the basis to convict [Beard] of this count." We disagree. As the People note, our Supreme Court in

*People v. Riel* (2000) 22 Cal.4th 1153 rejected a similar argument. In *Riel*, the defendant robbed a truck stop clerk at the till then forced him into a car where, according to a codefendant, the defendant robbed him of his wallet. (*Id.* at pp. 1173-1199.) The defendant was charged with a single count of robbery. (*Id.* at pp. 1172, 1199.) He argued the absence of a unanimity instruction could have allowed a divided jury to convict him without deciding on which act of robbery he committed. (*Id.* at p. 1199.) Our Supreme Court rejected that theory, explaining "[i]t was conceivable that some, or even all, of the jurors might have had a reasonable doubt that the robbery in the car occurred. They might have considered it a possible embellishment on [the codefendant's] part. These jurors might have found [the] defendant guilty based on the truck stop robbery but not the car robbery. But the reverse is not true. If the jury believed [the codefendant], [the] defendant was clearly guilty of the truck stop robbery, which the physical evidence shows occurred. It is inconceivable that a juror would believe [the codefendant's] testimony that [the] defendant committed the robbery in the car but somehow find he did not commit the truck stop robbery." (*Id.* at pp. 1199-1200.)

The same is true here. D.H. testified she was raped more than once. Officer Herriott testified D.H. told him Beard forced her to orally copulate him, raped her, then made her shower. Detective Blakemore testified D.H. told him Beard forced her to orally copulate him, raped her, made her shower, raped her again, then made her shower again. Even if it was conceivable that jurors could have found Beard committed the first act of rape but not the second, it is inconceivable the jury could have concluded that Beard committed only the second rape. Because the jury returned a guilty verdict on the rape charge, the jurors necessarily all concluded Beard committed at least the first act of rape.

Next, Beard contends "[t]he continuous course of conduct exception does not apply here because there was a reasonable basis for the jury to distinguish between the acts." In support of that proposition, Beard directs us to the trial court's comment when it

was considering whether to impose a consecutive sentence—"there is no way [for the court] to determine which act of rape that the jury determined was the act of rape" that sustained the conviction. The court's comment was made in the context of determining whether Beard had an opportunity to reflect on his actions, which would tend to support a finding he committed the sex offenses on "separate occasions." (§§ 667.61, subd. (i), 667.6, subd. (d) ["In determining whether crimes against a single victim were committed on separate occasions …, the court shall consider whether, between the commission of one sex crime and another, the defendant had a reasonable opportunity to reflect upon his or her actions and nevertheless resumed sexually assaultive behavior."])

Whether crimes were committed on separate occasions for purposes of imposing consecutive sentences is a distinct inquiry from whether criminal acts were committed as part of a continuous course of conduct for purposes of requiring a unanimity instruction. For consecutive sentencing purposes, "[a] finding that the defendant committed the sex crimes on separate occasions 'does not require a change in location or an obvious break in the perpetrator's behavior.' " (*People v. King* (2010) 183 Cal.App.4th 1281, 1325 (*King*).) Indeed, a trial court may properly find that a defendant had "reasonable opportunity for reflection" and therefore his sex crimes took place on "separate occasions" for purposes of section 667.6, subdivision (d), even where the defendant " 'merely' changed positions" in the same location (*People v. Irvin* (1996) 43 Cal.App.4th 1063, 1071; *People v. Jones* (2001) 25 Cal.4th 98, 104-105) or momentarily ceased and then resumed the series of sex acts (*King*, *supra*, at p. 1325).

Conversely, for unanimity instruction purposes, whether several acts constitute a single course of conduct depends on the nature of the offenses and their proximity in time. (*Champion*, *supra*, 9 Cal.4th at p. 932; *Gonzalez*, *supra*, 141 Cal.App.3d at p. 791.) As seen in *Champion*, a series of similar sex offenses, even when interrupted by the defendant leaving the location of the crime, can constitute a single course of conduct,

18.

removing the need for a unanimity instruction. (*Champion*, at p. 932; *People v. Mota* (1981) 115 Cal.App.3d 227, 233 [a continuous course of conduct existed where a defendant kidnapped and repeatedly raped the victim over the course of two hours in the back of a moving vehicle].)

In like fashion, whether a reasonable basis exists to distinguish between acts for purposes of requiring a unanimity instruction is unrelated to whether a defendant had the opportunity to reflect upon his misconduct for purposes of consecutive sentencing. Even where a defendant had ample time to reflect between acts, no unanimity instruction is required unless the jury could find one act true and the other untrue. (E.g. *People v. Percelle* (2005) 126 Cal.App.4th 164, 182 (*Percelle*) [no reasonable basis to distinguish between the defendant's first attempted fraud and his second attempted fraud an hour later].)

Here, the trial court evidently understood the distinction between the separate occasion inquiry for consecutive sentencing purposes and the continuous course of conduct inquiries for unanimity instruction purposes. It found the rapes occurred on separate occasions and recognized that the jury did not have to distinguish between the acts that could sustain the rape conviction because they could consider the entire course of conduct. The trial court's comment did not suggest either that the two acts of rape were not substantially similar in nature and close in time or that it was possible for the jurors to distinguish between the acts in a manner that would permit them to find Beard committed one act but not the other. Further, there is nothing inconsistent about the court's determinations that the two rapes occurred on separate occasions *and* constituted a continuous course of conduct.

Next, Beard contends a unanimity instruction was required because the "court also commented that the prosecutor could have alleged a second count of rape" based on the facts presented. However, "[i]t is immaterial [for purposes of instructing on unanimity]

that the two acts might have been charged as two separate [counts]." (*Percelle, supra*, 126 Cal.App.4th at p. 182.) Where there is no evidence from which the jury could have found the defendant committed one act but not the other, a unanimity instruction was not required. (*Ibid.*, citing *People v. Riel, supra*, 22 Cal.4th at p. 1199.) As explained above, the jury could not have concluded that Beard committed the second act of rape but not the first.

Finally, even if we were to assume such an instruction was required, the failure to give it was harmless even under the *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*) standard of beyond a reasonable doubt. (*Hernandez, supra*, 217 Cal.App.4th at pp. 576-577 [acknowledging a split of authority on the correct standard for determining if a trial court committed harmless error when it fails to give a unanimity instruction]; *People v. Vargas* (2001) 91 Cal.App.4th 506, 561.)[10]

"[E]rroneous failure to give a unanimity instruction is harmless if disagreement among the jurors concerning the different specific acts proved is not reasonably possible." (*People v. Napoles* (2002) 104 Cal.App.4th 108, 119, fn. omitted.) Where a "defendant offered the same defense to all criminal acts, and 'the jury's verdict implies that it did not believe the only defense offered,' failure to give a unanimity instruction is harmless error." (*Hernandez, supra,* 217 Cal.App.4th at p. 577; *People v. Wolfe* (2003) 114 Cal.App.4th 177, 188 [failure to give unanimity instruction was harmless error where jury clearly rejected unitary defense to all criminal acts].) Such is the case here—the jury's verdict makes clear it did not believe Beard's defense that he was not at D.H.'s

---

**10** In the context of a trial court's failure to give a unanimity instruction, "[s]ome cases hold that the prejudice must be deemed harmless beyond a reasonable doubt under *Chapman* ... [, *supra*,] 386 U.S. 18 …. Other cases hold that the test is as enunciated in *People v. Watson* (1956) 46 Cal.2d 818, 836 … (*Watson*), which is whether 'it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.' " (*People v. Vargas, supra*, 91 Cal.App.4th. at pp. 561-562.)

20.

house on the date of the rape and that D.H. fabricated the story when he refused to hurt her husband.  If nothing else, the jury concluded Beard forced D.H. to orally copulate him, raped her, robbed her, and threatened to harm her if she reported his crime.  Failure to give a unanimity instruction was therefore harmless under either *Watson* or *Chapman*.

## II.     Consecutive Sentencing

Beard argues the trial court erred in imposing the term on count 2, the oral copulation count, to run consecutively to the term imposed on count 1, the rape count. He contends that (1) because the trial court could not determine from the verdict whether the jury based the rape conviction on the first or second act of rape, the court violated his Sixth Amendment right to confrontation in concluding that the oral copulation and rape were committed on separate occasions for purposes of imposing a consecutive sentence; and (2) the trial court erroneously applied the "continuous course of conduct" standard of section 654, rather than the "separate occasions" standard of section 667.61, subdivision (i), in imposing a consecutive sentence.  The People counter that (1) the Sixth Amendment does not require juries to determine facts necessary to the imposition of consecutive sentences, and (2) the trial court properly applied the section 667.61, subdivision (i) standard.  We agree with the People on both accounts.

### A.     Background

The trial court explained the factual basis and its reasoning for imposition of a consecutive sentence:

> "[THE COURT:]  From putting together both the testimony of [D.H.] as well as her earlier statements at the time she was interviewed by law enforcement, … it appears that, as [defense counsel] has described it, you have the oral copulation followed immediately by the sexual intercourse or the rape, which there isn't a lot of things—factors in there— … you could argue that both ways, but that's much more difficult to separate those two instances.
>
> "You do clearly have the break where she was taking a shower.  In that break, where she attempted to flee, is probably the time period when he

21.

came back, and then there was actually, it would appear, a second act of rape, which was then probably interrupted based upon the discussion about the paper, and then resumed.

"I don't know for sentencing purposes—and this is occurring to me now; I'm thinking out loud a little bit here—the jury had a continuous course of conduct to make a determination on. There's no need for them to distinguish one act from the other. There was—I think the facts support the—and the law support[s] the verdict of the jury.

"*But for purposes of determining the Court's sentencing, whether it's consecutive or concurrent; that is, was there a sufficient break to allow [Beard] to contemplate his actions and choose to seek another course of action, or did he choose, then, to continue on with it?* To justify the consecutive sentencing, I think, under your argument, [prosecutor], there [were] clearly several major breaks, and he resumed the acts, that's clearly true. With [defense counsel's argument], there was the earlier act, where they just flowed from one to the other, and I don't think the facts there would justify a consecutive sentencing. *But you have a number of different breaks, which clearly show he had a chance to change the direction of what was going on, insist [D.H.] take a shower, restrain her from flight, and then take her back and continue. That clearly justifies a consecutive sentencing.* The rape, broken by discussion regarding the tax paperwork, then to resume the rape, that clearly justifies. But the first, I think … the transition from the oral copulation to the rape, that transition, initially on the bed, seemed to flow from one act to the other without a significant break." (Italics added.)

The court continued:

"I think, [defense counsel], your argument that transition from the oral cop[ulation] to the forcible rape was a continuous course of conduct [is correct]. I agree with [the prosecutor], though, that … there were several breaks …. I think there was actually factually two separate breaks after that which gave [Beard] sufficient time to reflect and move out of the room or move around the room, from the bedroom to the bathroom, back to the bedroom; from the bedroom then, to look at these papers, and then back. [¶] … I think from an overall point of view, when you have a significant course of conduct that lasts for a duration of an hour or more involving a number of different sex acts with significant breaks in them, and factually the jury could have decided that the rape occurred immediately following the oral copulation, the rape occurred after the first bathroom break; the rape occurred after the break to look at the papers. Factually, the jury could

22.

make a determination anywhere along there. We don't know what determination they made."

The court concluded:

> "So for appellate review I want it clear that … I [have] laid out the facts as I believe they exist that the jury considered; that I understand the defense argument, and I agree with it, and that there is no way to determine which act of rape that the jury determined was the act of rape, and they didn't have to; they could have considered it in the totality of the circumstances. *That under these facts it does justify the consecutive sentencing because it shows a significant course of conduct, significant changing of opportunity for [Beard] to reflect and to cease his attack at any time and yet the attacks continued to resume. So I think under these facts it does justify a consecutive sentencing on [the] second count.*" (Italics added.)

## B.    Statutory Framework

Section 667.61, subdivision (i) requires that the trial court "impose a consecutive sentence for each [listed sex] offense that results in a conviction … if the crimes … involve the same victim on separate occasions as defined in subdivision (d) of Section 667.6."[11]  "In determining whether crimes against a single victim were committed on separate occasions …, the [trial] court shall consider whether, between the commission of one sex crime and another, the defendant had a reasonable opportunity to reflect upon his or her actions and nevertheless resumed sexually assaultive behavior. Neither the duration of time between crimes, nor whether or not the defendant lost or abandoned his or her opportunity to attack, shall be, in and of itself, determinative on the issue of whether the crimes in question occurred on separate occasions."  (§ 667.6, subd. (d).)  When section 667.61, subdivision (i) does not mandate imposition of consecutive sentences, a trial court has discretion to impose concurrent or consecutive sentences pursuant to section 669.  (§ 669, subd. (a); *People v. Valdez* (2011) 193 Cal.App.4th 1515, 1524.)

---

[11]    Forcible rape and oral copulation are both listed sex offenses for purposes of section 667.61, subdivision (i).  (§ 667.61, subd. (c)(1), (c)(7).)

23.

Section 654, subdivision (a) provides that "[a]n act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." The inquiry to determine whether separate sentences can be imposed pursuant to section 654 is "[w]hether a course of criminal conduct is divisible and therefore gives rise to more than one act." (*Neal v. State of California* (1960) 55 Cal.2d 11, 19 (*Neal*); *People v. Correa* (2012) 54 Cal.4th 331, 335-336 (*Correa*).) That inquiry turns on " 'the intent and objective' " of the defendant. (*Correa*, at p. 336.) " 'If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one.' " (*Ibid*.)

## C. The Constitutional Challenge

Beard contends that because the jury did not necessarily conclude he committed the second act of rape, the trial court's consideration of the second act of rape to impose a consecutive sentence violated his constitutional right to have a jury find true beyond a reasonable doubt any fact used to increase his maximum sentence. We disagree.

Under the Sixth Amendment to the United States Constitution, as explained by *Apprendi v. New Jersey* (2000) 530 U.S. 466 at page 490 (*Apprendi*), "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." (*People v. Nguyen* (2009) 46 Cal.4th 1007, 1015 (*Nguyen*).) However, the United States Supreme Court has also made clear the Sixth Amendment does not preclude judges, rather than juries, from finding of facts necessary to the imposition of consecutive, rather than concurrent, sentences for multiple offenses. (*Oregon v. Ice* (2009) 555 U.S. 160, 168-172 (*Ice*);[12] *People v. Scott* (2015) 61 Cal.4th

---

[12] "As pointed out (and criticized) by the dissent in *Ice,* the focus of the majority's rationale [in *Ice*] was *not* on whether the trial court's finding of facts necessary to support the imposition of consecutive sentences increased the overall punishment for the

363, 405; *People v. Capistrano* (2014) 59 Cal.4th 830, 884, overruled on another ground by *People v. Hardy* (2018) 5 Cal.5th 56, 104; see *Nguyen*, at p. 1018, fn. 9 ["It is also now clear that *Apprendi* does not require a jury determination of facts bearing on whether to impose concurrent or consecutive sentences for separate offenses."]; see also *People v. Wiley* (1995) 9 Cal.4th 580, 586 ["the ability of courts to make factual findings in conjunction with the performance of their sentencing functions has never been questioned"].)

In his reply, Beard acknowledges "sentencing determinations are generally not covered by *Apprendi* considerations." However, Beard argues that this case is different because the guilty verdict does not necessarily indicate that the jury found he committed the second act of rape. Beard contends the jury may have concluded that he committed the forced oral copulation, then transitioned directly into the first act of rape, and did not commit a second act of rape at all. Because the jury may have so concluded, Beard argues, the trial court was not permitted to "rely on its own factual finding of guilt of an uncharged crime—[i.e. the second act of rape—]as a basis to impose consecutive sentencing." Beard argues therefore that imposing a consecutive sentence based on the second act of rape was effectively judicial factfinding on a separate crime and a violation of the Sixth Amendment.

Preliminarily, as we concluded in section II. of the Discussion, *ante*, the two acts of rape were part of a continuous course of conduct and neither Beard's defense nor the evidence before the jury provided any reason for the jury to distinguish between the acts.

_____

defendant's crimes 'beyond the prescribed statutory maximum.' " (*People v. Mosley* (2015) 60 Cal.4th 1044, 1058-1059.) "Instead, the majority in *Ice* relied on historical practice evidencing the absence of any traditional role played by jury at common law in the determination whether to impose consecutive sentences, as well as principles of state sovereignty over the States' administration of their criminal justice systems, to conclude *Apprendi*'s Sixth Amendment jury trial guarantee is not implicated in a decision to impose consecutive sentences." (*Id.* at p. 1059.)

For that reason, the jury's verdict reflects that the jury found Beard to have committed both acts of rape. The trial court therefore did not rely on any facts at sentencing not necessarily determined by the jury to be true beyond a reasonable doubt.

Next, even assuming Beard is correct that the jury could have found the second act of rape did not take place and still arrive at its verdict, the Sixth Amendment is not implicated. The trial court's factual finding—that the offense involved "a significant course of conduct that last[ed] for a duration of an hour or more[,] involving a number of different sex acts with significant breaks in them"—was made for purposes of determining whether to impose a concurrent or consecutive sentence. The trial court did not, as Beard suggests, find that the sentences on counts 1 and 2 should run consecutively because Beard committed an *uncharged* rape. Nor did the court impose any punishment for an uncharged rape. For purposes of imposing consecutive sentences, the court found that the entire course of conduct (the first and second acts of rape) provided the factual basis for Beard's single rape conviction. That determination was not subject to the *Apprendi* line of cases and was not required to be submitted to the jury to be found beyond a reasonable doubt because it was a determination made only for the purpose of determining whether to impose a consecutive term of imprisonment. (*Ice, supra*, 555 U.S. at p. 170; *People v. Scott*, *supra*, 61 Cal.4th at p. 405 [" 'the Sixth Amendment's restriction on judge-found facts' is 'inapplicable' when a trial judge makes factual findings necessary to the imposition of consecutive terms"].)

The trial court did not commit constitutional error in imposing a consecutive sentence on count 2.

### D.   Statutory Challenge

Beard contends the trial court inappropriately applied the standard for section 654, rather than section 667.61, subdivision (i), in deciding whether to impose consecutive sentences. He points to the trial court's comment that "the significant issue of the

sentencing[] is whether [the sentence on the rape count should be stayed pursuant to section] 654." We disagree with his conclusion.

A review of the trial court's explanation of its reasons for imposing a consecutive sentence as to the rape conviction belies Beard's argument. The trial court set out the correct standard: "[F]or purposes of determining the Court's sentencing, whether it's consecutive or concurrent; that is, was there a sufficient break to allow [Beard] to contemplate his actions and choose to seek another course of action, or did he choose, then, to continue on with it?" (See §§ 667.6, subd. (d) ["In determining whether crimes against a single victim were committed on separate occasions under this subdivision, the court shall consider whether, between the commission of one sex crime and another, the defendant had a reasonable opportunity to reflect upon his or her actions and nevertheless resumed sexually assaultive behavior."], 667.61, subd. (i) [incorporating the "separate occasions" test set out in § 667.6, subd. (d)].) The trial court then clearly explained that "factually [there were] two separate breaks after [the oral copulation and first act of rape] which gave [Beard] sufficient time to reflect and move out of the room or move around the room, from the bedroom to the bathroom, back to the bedroom; from the bedroom[,] then[] to look at these papers, and then back." The court later concluded "consecutive sentencing [is justified] because [the facts of the case] show[] a significant course of conduct [and] significant changing of opportunity for [Beard] to reflect and cease his attack at any time and yet the attacks continued to resume." Although the trial court used the term "course of conduct"—language used both in the context of giving a unanimity instruction and determining whether separate sentences can be imposed pursuant to section 654—the court's finding tracks the language of section 667.6, subdivision (d). Specifically, the court concluded Beard had time to reflect but nevertheless resumed sexually assaultive behavior—in other words, it concluded that the oral copulation count and the rape count constituted "separate occasions" for purposes of section 667.6,

27.

subdivision (d) and section 667.61, subdivision (i). Because the trial court concluded Beard committed the oral copulation and rape on "separate occasions," it was required to impose consecutive sentences. (§ 667.61, subd. (i).) We find no error.

## III. Section 654 Stay

Beard argues his sentence for false imprisonment should be stayed because the convictions for rape and false imprisonment were predicated on an indivisible act or transaction that pursued a single intent. Beard caught D.H. when she tried to run away, forced her to the bed, and raped her, all for the single objective of raping D.H. The People respond that "[t]he false imprisonment facilitated not only the assault but also the theft of [D.H.'s] property, for which [Beard] was not separately convicted or sentenced." For that reason, the People argue, Beard was appropriately sentenced for false imprisonment and rape. We agree with the People.

### A. Background

In her closing argument, the prosecutor argued the false imprisonment took place when D.H. "tried to run away from … [Beard], and he grabbed her hand and grabbed her back." At sentencing, the court also set out its view of the factual basis for the offense: "This was the restraint of [D.H.] … during one of the breaks between the sexual attacks where she attempted to flee out of the bathroom and was restrained forcibly by [Beard]."

The trial court found, with respect to all of the crimes of conviction: first, "the crimes and their objectives were predominantly independent of each other; second, the crimes were committed at different times or separate places rather than being committed so closely in time and in place as to indicate a single period of abhorrent behavior; and third, the crimes involved separate acts of violence with threats of violence." Based on those findings, the court imposed (and did not stay) sentences for each offense.

28.

**B.     Analysis**

As noted in section II.B. of the Discussion, *ante*, the test for whether separate sentences can be imposed pursuant to section 654 is "[w]hether a course of criminal conduct is divisible and therefore gives rise to more than one act." (*Neal*, *supra*, 55 Cal.2d at p. 19.)  That inquiry turns on " 'the intent and objective' " of the defendant. (*Correa*, *supra*, 54 Cal.4th at p. 336.)  " 'If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one.' " (*Ibid*.)  "In such a case, the proper procedure is to stay execution of sentence on one of the offenses." (*People v. Monarrez* (1998) 66 Cal.App.4th 710, 713.)  "On the other hand, if the evidence discloses that a defendant entertained multiple criminal objectives, which were independent of and not merely incidental to each other, the trial court may impose punishment for independent violations committed in pursuit of each objective even though the violations shared common acts or were part of an otherwise indivisible course of conduct." (*People v. DeVaughn* (2014) 227 Cal.App.4th 1092, 1112 (*DeVaughn*).)

"The question of whether section 654 is factually applicable to a given series of offenses is for the trial court, and the law gives the trial court broad latitude in making this determination.  [Citation.]  Its findings on this question must be upheld on appeal if there is any substantial evidence to support them." (*DeVaughn*, *supra*, 227 Cal.App.4th at p. 1113.)  " ' "We must 'view the evidence in a light most favorable to the respondent and presume in support of the [sentencing] order the existence of every fact the trier could reasonably deduce from the evidence. " ' " (*Ibid.*)

Beard contends the evidence supports only the conclusion that he grabbed D.H. "as she tried to run out of the bathroom … to enable further sexual contact with her." Beard argues there is no evidence "in the record suggesting that grabbing the victim was necessary to take her laptop from her residence.  There was no reported resistance to him

29.

taking the item, nor is there any other evidence suggesting the [false imprisonment and theft] were related." The People argue the fact Beard stole D.H.'s laptop suggests that his objectives in restraining D.H. when she attempted to flee also included stealing her property.[13]

As a preliminary matter, we note that Beard's position on appeal is inconsistent with the argument defense counsel presented to the jury. At trial, defense counsel argued the jury should find the burglary with intent to commit rape enhancement not true because Beard had none of the "supplies that someone who intends to commit a rape carries with them." Instead, "the perpetrator had items only that would be considered useful in a burglary, in a theft." "[I]t's a reasonable conclusion that the entry was only for the purpose of theft."

Next, the evidence suggested Beard entered the house and restrained D.H. with the objectives of both stealing from D.H. and raping her. D.H. testified that after the second act of rape, Beard forced her to walk in front of him around the house to search for valuables and commented when he found nothing valuable. That evidence supports a finding Beard planned to steal from D.H. because he searched for valuables. (See *People v. Ratcliffe* (1981) 124 Cal.App.3d 808, 818-819.) Committing a theft appeared to be part of Beard's plan rather than merely an afterthought. Here, a reasonable trier of fact could have concluded Beard restrained D.H. with at least two objectives—to rape her and to force her to show him her valuables so he could steal from her.

---

**13** Alternatively, the People present a wider view of the factual basis for the false imprisonment conviction: "the court could have reasonably concluded that the false imprisonment extended through the time that [Beard] led [D.H.] through the house to rifle through her belongings." However, we need not reach that argument because we conclude substantial evidence supported the trial court's conclusion that the false imprisonment, committed when Beard grabbed D.H. as she fled, was committed to steal from D.H. as well as to rape her.

30.

Substantial evidence supported the trial court's determination that Beard harbored multiple intents and objectives, including stealing from and raping D.H., when he falsely imprisoned her. Those objectives were not merely incidental to each other and Beard was not otherwise punished for the theft offense. (See *People v. Davis* (1987) 191 Cal.App.3d 1365, 1369 [where the defendant entertained the objectives of robbing and raping the victim, which "were in no way merely incidental to each other," the defendant could be separately punished for rape and kidnapping for purpose of robbery].) For that reason, the trial court was not required to stay the sentence on the false imprisonment conviction. (*DeVaughn*, *supra*, 227 Cal.App.4th at p. 1112.) We find no error.

**IV. Senate Bill No. 136**

In supplemental briefing, Beard asserts, and the People concede, that Beard's nine 1-year enhancements for prior prison terms served for non-sexually violent offenses should be stricken. We agree.

Effective January 1, 2020, Senate Bill No. 136 amended section 667.5, subdivision (b), to limit prior prison term enhancements to only prior terms that were served for a sexually violent offense as defined by Welfare and Institutions Code section 6600, subdivision (b). (§ 667.5, subd. (b).) (Stats. 2019, ch. 590, § 1.) That amendment applies retroactively to all cases not yet final on Senate Bill No. 136's effective date. (*People v. Lopez* (2019) 42 Cal.App.5th 337, 341-342.)

Here, the trial court imposed three 1-year prior prison term enhancements on counts 1, 2, and 4, for a total of nine additional years. Two of the prior prison terms were served for second degree burglary and the third was served for possession of a stolen vehicle and evading a peace officer, none of which are sexually violent offenses as defined in Welfare and Institutions Code section 6600, subdivision (b). On January 1, 2020, Beard's case was not yet final. Therefore, as the parties agree, Beard is entitled to

the ameliorative benefit of Senate Bill No. 136's amendment to section 667.5, subdivision (b).[14]

Because the trial court imposed the maximum possible sentence, there is no need to remand the matter to the trial court to exercise its discretion.  (*People v. Buycks* (2018) 5 Cal. 5th 857, 896, fn. 15; *People v. Lopez*, *supra*, 42 Cal.App.5th at p. 342.)

## DISPOSITION

The nine section 667.5, subdivision (b), enhancements are stricken.  The trial court is directed to prepare a new abstract of judgment reflecting the modification and forward a copy to the California Department of Corrections and Rehabilitation.  As so modified, the judgment is affirmed.

SMITH, J.

WE CONCUR:


HILL, P.J.


DETJEN, J.

---

[14]    Beard's claim that enhancements should not have been imposed more than once per prior prison term is now moot.